OPINION
In this consolidated appeal, appellant Alexia Wilde, D.V.M., appeals two Judgment Entries of the Licking County Court of Common Pleas. In each appeal, appellee is the Ohio Veterinary Medical Licensing Board (hereinafter "OVMLB" or "Board"). In the first appeal, case 98CA00025, appellant appeals the December 10, 1997 Judgment Entry of the Licking County Court of Common Pleas which affirmed the Ohio Veterinary Medical Licensing Board's decision to revoke appellant's license. In the second appeal, case number 98CA00138, appellant appeals the December 22, 1998 Judgment Entry of the Licking County Court of Common Pleas, which granted appellee's motion to dismiss. We consolidated the appeals into case number 98CA00138.
 STATEMENT OF THE FACTS AND CASE
On April 28, 1997, the OVMLB issued a Notice of Opportunity for Hearing to appellant. In that notice, appellant was advised of ten charges made against her in connection with her veterinary practice. The charges included:
 1. Permitting an unlicenced veterinarian to perform veterinary services.
 2. Gross incompetence; Filing a false report or document.
 3. Failing to cage or house animals in good health and in a humane manner due to failure to maintain sanitary conditions at her vet clinic.
 4. Abusing animals identified as, Samantha Delawader, Shep Wallace, Dakota Smoke, Rocky Lee, Gretchen Waddle, and Jazz Reed, and numerous other patients, by beating or hanging them by a leash.
5. Refusing to meet with clients.
 6. Falsifying medical record of animal identified as, "Harley Schneider".
 7. Creating two and filing one anonymous letter of complaint with the Vet Board against Ronald Fuller, DVM.
 8. Falsely reporting the death of two Doberman puppies and, instead, giving the puppies to Caroline Raike. Falsely reporting the death a Great Pyrenees dog, and instead, giving the dog to Edna Laytham.
 9. Consuming alcohol during business hours, and during surgery.
 10. Dismissing a dog, "Snowflake Zellefrow," from care without first properly treating a bloody discharge.
The parties presented testimony and exhibits at a three day oral hearing from October 22, 1997 through October 25, 1997. The following evidence was adduced at the hearing. Appellee first presented the testimony of Dr. Tamatha Lee Barickman, a veterinarian. Dr. Barickman testified she had been employed by appellant's veterinary clinic, Vet One, for over four years. Dr. Barickman testified she was concerned about the dirt; feces and urine in the cages; the cockroaches, clutter and general filth. T. at 25. She testified surgery tables and surgical instruments were not cleaned or sterilized between surgeries. T. at 28, 30. She further testified appellant routinely beat animals in her care with a wiffle ball bat wrapped with duct tape. She testified this behavior was much more forceful then a tap on the head to get the animals attention. T. at 30. On cross-examination, Dr. Barickman's admitted she performed surgeries at Vet One in the same unsanitary conditions. She never reported the situation to the Board, and took all of her pets to appellant's clinic for treatment. Further, Dr. Barickman admitted she owed appellant a substantial sum of money. Appellee next presented the testimony of Edna Denise Laythem, who was employed as a veterinarian assistant for two years with appellant's clinic. It was her responsibility to clean the cages, feed the animals, and assist the doctor. T. at 67. Ms. Laythem testified the clinic, including the surgical rooms, was unsterile and filthy. She testified appellant beat her patients with a wiffle ball bat. Specifically, Ms. Laythem testified appellant abused two Sheba Inus, Cee Celoa. T. at 74. Ms. Laythem testified appellant would "hang those dogs for nail trims" when they would come in. After the dogs would pass out from being hung, she would muzzle them and trim their nails. T. at 74. Ms. Laythem also testified about the abuse of a dog named "Duke Buddy Johnson", "that dog usually would get a beating when it came in." T. at 74. Finally, Ms. Laythem testified she had seen, on numerous occasions, lay employees surgery at Dr. Wilde's clinic. T. at 76-79. On cross-examination, Ms. Laythem admitted she had lied to the Licking County Sheriff's Department when they investigated the disappearance of an animal from Petland. Although Ms. Laythem testified she quit due to the persistent abuse of animals at the clinic, she never reported the activity to the Humane Society or the Veterinary Board. Finally, Ms. Laythem testified she brought her own pets to Dr. Wilde's clinic throughout her course of employment there. Appellee next presented the testimony of Kimberly Dawn Fox, who was previously employed by appellant as a veterinarian assistant. She testified the clinic was extremely dirty. In fact, appellant reused soiled instruments in surgeries without re-sterilization between surgeries. T. at 120. She further testified appellant's abuse of animals in her care was extensive and pervasive. T. at 121-129. Finally, Ms. Fox testified she watched appellant consume alcohol while treating animals, and at times, while conducting surgeries. T. at 133. On cross-examination, Ms. Fox admitted she had a difficult time remembering any specific animal appellant abused, but she then attempted to describe one dog as a Rottweiler mix or a German Shepard mix. T. at 138-140. Finally Ms. Fox testified there was animosity between her and appellant at the end of their working relationship due to a conflict over hours. T. at 145. Appellee next presented the testimony of James Thompson, the chief investigator for the Ohio Veterinary Licensing Board. Mr. Thompson testified appellant's facility was kept in an unsanitary condition, and had an offensive odor. Mr. Thompson examined the clinic and found the surgery room neither clean nor sanitary. The treatment room was disorderly, and some of the animal cages were not properly cleaned. T. at 155-156. When Mr. Thompson returned for a second day of investigation, he found the clinic had been organized and cleaned, but the pharmacy refrigerator contained outdated drugs and testing materials. T. at 157. The testimony of Richard Bednarski, a licensed veterinarian, and the Hospital Director of the Ohio State University Veterinary Hospital was next. Dr. Bednarski testified as an expert with regard to general standards of cleanliness and sanitation in veterinary clinics. Dr. Bednarski reviewed Mr. Thompson's report, and the accompanying photographs, and opined the clinic had not been cleaned in some time. It was not, in his expert opinion dirt which accumulated in one or two days. Appellee next presented the testimony of Kathleen Hinkle, a veterinary assistant, and previous employee of appellant. Ms. Hinkle testified she left the employ of appellant because of the conditions and the working environment. T. at 219. These "conditions" included infestations of mice, roaches, and a general lack of cleanliness. While Ms. Hinkle testified it was her duty to perform cleaning, she felt there were not enough employees to keep the facility sanitary. T. at 222. Ms. Hinkle witnessed other non-veterinarian employees performing surgical procedures. T. at 223. Ms. Hinkle testified about incidents of abuse where appellant would severely beat animals with a wiffle ball bat, using as much force appellant could muster. T. at 222. Ms. Hinkle explained she witnessed at least three separate incidents where animals were beaten to a point where they bled or had teeth knocked out. She stated "usually you'd find the teeth on the floor after the animal's [sic] been beaten." T. at 228. She further testified she never remembered sweeping up any teeth herself. Id. Ms. Hinkle also testified appellant would "hang animals" with all four of their feet off of the floor by a leash until the animal was unable to fight back. Id. Apparently this was a frequent occurrence. Ms. Hinkle testified appellant would perform this "procedure" "if they showed any inclination that they weren't going to comply with what we needed to do." T. at 223. On cross examination, Ms. Hinkle admitted she did not report the abuse to police, to the Humane Society, or the Veterinary Board prior to being contacted by Mr. Thompson. Ms. Hinkle further testified she allowed her dog to be treated at the facility several times while she was employed at the clinic. T. at 229. Appellee next presented the testimony Jeanette O'Quinn, a licenced veterinarian who previously worked for appellant. Dr. O'Quinn also testified to the unsanitary conditions in the facility and to the poor surgical conditions. T. at 237. On cross-examination appellant's attorney elicited Dr. O'Quinn was actually fired from appellant's business. On the second day of testimony, appellee presented the testimony of Tracy Stanek-Krutel, a licensed veterinarian and a previous employee of appellant's clinic. Dr. Stanek testified she worked for appellant for three months and left for personal and professional differences. T. at 255. She testified to unsanitary conditions in the treatment and surgery rooms, and several incidents of appellant beating different dogs over the head with a plastic bat and using a leash to choke them. Dr. Stanek testified A. * * * I witnessed her beating a dog — several dogs over the head with a plastic bat and using a leash to basically choke them, because they were struggling to the extent that they could not be restrained any other way. I did not see any abuse that led to lacerations or broken bones * * *." T. at 257.
* * *
 Q. You were discussing the hanging of an animal with a leash. Can you describe to me what [appellant] would do under those circumstances that you witnessed?
 A. The loop would be placed around the neck and then the leash would be stretched to restrain them because they were trying to jump or trying to climb a person's body. And the end result would be that they would choke because they were so excited; they would cut off their own air supply.
 Q. Do you remember any specific examples of when this occurred, animal names or types of animals?
A. No.
 Q. What types of action should a veterinarian take if an animal becomes out of control?
 A. One action is to stop what you're doing and let the animal have a chance to calm down and try again. Another one is to take it in a quiet room, and that would be an exam room or a surgery room where there were not other animals to excite it or cause it to become more excited. And another is to send it home if the procedure that you're trying to perform is not an emergency, not something that needs to be done that day, and have the owner give it a tranquilizer before they come an try again at a later date.
 Q. The type of force that [appellant] used on animals, do you believe that this was appropriate to restrain the animals?
A. In some cases, I do not.
 Q. Do you have an opinion, to a reasonable degree of veterinary certainty, whether the amount of force [appellant] used when treating animals departed from the minimal standards of care of similar veterinarians under similar circumstances?
A. Yes, I do.
Q. And what is that opinion?
 A. I am of the opinion that most of the restraint that I witnessed was excessive.
T. at 257 — 259.
Next to testify was Jason Osterstock, a previous employee of appellant. Mr. Osterstock testified it was one of his primary responsibilities to keep the clinic in working order and in a sanitary condition. T. 267. It was his testimony the sanitary conditions of the facility were generally good with no "chronic problems." T. at 267. Mr. Osterstock testified he performed two spays and one neuter surgeries although he was not a veterinarian. These surgical procedures were done on stray animals. At the time Mr. Osterstock was an undergraduate student in animal science. In cross-examination, Mr. Osterstock stated: "I would say there were times when there were dogs that were vicious, unruly, dangerous, where we needed to use physical means of restraint and I think that there were times when the limit was pushed. But I can't think of any specific time what I would call an excessive force was used, and I would believe that if it occurred, I would have stopped it."
T. at 274.
Next, appellee presented the testimony of Christine Schneider, a previous client of appellant. Ms. Schneider testified appellant told her a previous treating veterinarian had misdiagnosed Ms. Schneider's animal. Appellant was able to treat the animal. With appellant's assistance, Ms. Schneider filed a grievance against the previous treating veterinarian. Charles McBrien, a veterinary assistant who was employed by appellant at the time of the hearing testified next. Mr. McBrien had no concerns about the cleanliness or sanitary conditions of the facility. T. at 286. Mr. McBrien testified he witnessed individuals who were not veterinarians performing surgeries. In fact, he admitted he performed a neuter of his own dog. Appellee next presented the testimony of Caroline Raike, a previous employee of appellant. Ms. Raike did not work at the clinic, she worked at appellant's farm taking care of appellant's large animals. Ms. Raike testified appellant gave her two doberman puppies she had brought home from the clinic. The puppies were ill with parvo and Ms. Raike was told the owners did not want to go to the expense of treating the animals. Appellee next presented the testimony of Beth Anne Nauer, the manager of the Petland store which adjoined appellant's veterinary clinic. Ms. Nauer testified she took two doberman puppies infected with parvo to appellant for treatment. Because the Petland facility directly adjoined the clinic, after the doberman puppies appeared to be responding to appellant's treatment, Ms. Raike took the two puppies back to the Petland Kennels. When Ms. Raike came back to work the next day, the puppies were gone from the Petland kennels. Her employees informed her appellant's clinic had taken the puppies back. Ms. Raike called Vet One to inquire about the condition of the puppies and was told the dogs had died. Shortly thereafter, a friend of Ms. Raike had occasion to visit appellant's farm. While there, the friend saw and photographed two doberman puppies. Ms. Raike testified she believed the dogs were the same dogs appellant claimed died in the Vet One Clinic. T. at 312-315. Appellee also presented the testimony Mark Zellefrow, a previous client of appellant. Mr. Zellefrow testified appellant had treated his samoyed, Snowflake. T. at 363. Mr. Zellefrow testified when he picked up Snowflake after a minor surgery, blood was dripping from the incision, and she was "real lethargic." T. at 365. Mr. Zellefrow stated the person at the front desk told him the bleeding was common because they had just scrubbed and cleaned wound. Mr. Zellefrow was assured it was fine to take his pet home. He and his wife were about to leave on vacation and did not feel it appropriate to leave the dog in its condition with the neighbors as was planned. T. at 368. Mr. Zellefrow decided to take the dog back to appellant's office. When he returned from vacation, Snowflake appeared to be "a little better." Id. The following week, Mr. Zellefrow took Snowflake back to appellant a number of times because the sutures from the incision kept coming out. Toward the end of the week, appellant suggested Zellefrow consider having the dog euthanized. Based upon this suggestion, the Zellefrows decided to put Snowflake to sleep. Mr. Mrs. Zellefrow even prepared their children for Snowflake's death. The Zellefrows decided to take Snowflake to another clinic to put her to sleep. The family had every intention following through with the procedure that day. In fact, the Zellefrows took a box and blanket to wrap Snowflake for burial after the procedure. Instead, the new veterinarian, Dr. Thomas Dickerson, treated Snowflake and she steadily improved. Appellee then presented the testimony of Dr. Dickerson, the veterinarian who subsequently treated Snowflake. It was Dr. Dickerson's opinion if appellant allowed Snowflake to leave the clinic with a bloody discharge and failed to evaluate that discharge, appellant's care would have fallen below normal standards expected of a veterinarian. T. at 381. Appellee then presented the testimony John Weale, a licensed veterinarian. Dr. Weale offered an expert opinion on the use of "maximum restraint," when treating animals. Dr. Weale testified he would find repeatedly hitting an animal forcibly in its body or head with a plastic wiffle ball bat to be an unacceptable manner to restrain an unruly or aggressive animal. T. at 392. Dr. Weale also found suspending an animal by a leash around its neck until it became unconscious or passive was also unacceptable. T. at 393. However, on cross-examination, Dr. Weale opined it would perfectly acceptable to tap a large or aggressive animal on the head with the wiffle ball bat to distract them. T. at 397. Next appellee presented the testimony of Tracy Paul, who at the time of the hearing was employed by appellant at the Vet One Clinic. Ms. Paul testified she performed surgeries on stray animals including neuters and spays. T. at 400. Ms. Paul also testified she had administered medications and injections outside of the presence of a doctor or supervisor. Ms. Paul testified she gave oral medication to the animals along with certain injections as ordered by the doctor. She gave these medications even though there was no supervisor or veterinarian present at the time of the injection or administration of the medication. On cross-examination, Ms. Paul testified she had been at the clinic for 2 1/2 years and during that time had never witnessed appellant abuse any animal. T. at 403. On the third day of the oral hearing, appellee presented the testimony of Connie Horton. Ms. Horton had been employed by appellant as a groomer for approximately five years. Ms. Horton testified she was forced to leave her employment with appellant because of her statements to Mr. Thompson, the Board's investigator. Ms. Horton testified the condition of the facility "was always gross there was always blood, everything, anything you can think of, it was always there." T. at 419. Ms. Horton also testified appellant abused and beat the animals in her care. Ms. Horton stated some of the beatings were so bad she saw dogs' mouths bleed and teeth fall out. "I've seen canines busted, she just beat them." T. 422. Ms. Horton indicated appellant full swings over her head with the wiffle ball bat. T. at 431. Finally, Ms. Horton testified she witnessed appellant consuming alcohol during regular business hours:
 Q. Did you ever see her consuming alcohol while treating a patient?
A. She drank before she would go into a room.
 Q. Did you ever see her consuming alcohol while doing surgery?
 A. Yeah. I seen the beer can sat in between the legs of the dog.
 Q. And do you remember approximately on how many occasions you saw this?
 A. A lot there at the end, I guess. Well, in the last couple years.
T. at 424.
On cross-examination, Ms. Horton admitted that no matter the number of abusive situations she had seen, she never reported the behavior to the Humane Society, the Veterinary Board or the police because she needed the job. T. at 428-429. Although she saw these incidents of abuse, Ms. Horton took all three of her pets to appellant for treatment, including surgery. Appellant next presented the testimony of Susan Stoll, a receptionist who worked for appellant for almost 5 years. Ms. Stoll testified she was concerned with the cleanliness and sanitary conditions at the facility and appellant's abusive conduct toward animals. She testified she had witnessed appellant beating animals with a plastic bat and hanging the animals with leashes. She stated "there were times — a lot of times when the bat was taken completely over her head and full force down upon the animal." T. at 436. Finally, appellee presented the testimony of Michelle Smith, a veterinarian assistant who was previously employed at appellant's clinic. Ms. Smith testified she left that position because she was not comfortable with the conditions, specifically the sanitary condition of the clinic. T. at 444. Ms. Smith also testified appellant was abusive toward the animals in her care.
 Q. Can you describe to me that abusive conduct by Dr. Wilde?
 A. [Appellant] would use a wiffle ball bat. She would beat animals. She would hit them hard. I've seen her hold them up by a choke chain and hit them with the bat simultaneously such that on occasion the animals would pass out, you know, to the point where they were not breathing.
 Q. The wiffle ball bat that she used to beat the animals, can you describe to me how — what areas of the body of the a animal she would hit it with?
 A. In general, she would strike for the head. She would also hit other body parts, just depending on how the animal was flailing in an attempt to get away from her.
Q. How hard would she hit these animals?
 A. As hard as possible. Just over her head and as hard as she possibly could.
Ms. Smith also testified she witnessed non-veterinarians performing surgical procedures on animals and witnessed appellant drinking alcohol while treating patients. Finally Ms. Smith testified appellant told her appellant gave the two doberman puppies from Petland to one of her employees named Caroline. Appellant then presented her case, first calling Tony Delawder. At the time of the hearing, Mr. Delawder was a client of appellant. Mr. Delawder testified he believed his animals were always treated well, even "babied" at appellant's clinic. T. at 465. Although Mr. Delawder's chow was one of the allegedly abused animals, Mr. Delawder testified he had no reason to believe his animals were mistreated in anyway. In fact, Mr. Delawder said his animals always seemed to enjoy their visits there. Appellant next presented the testimony of Judith Boston, also a client of appellant. She testified she had never seen appellant abuse an animal and she believed her dog was always well cared for by appellant. She further testified that while she had seen animal waste in the treatment room, she did not believe the conditions to be unsanitary. In fact, she testified normally there was pervasive smell of disinfectant at the clinic. Appellant also called James E. Herman, a registered veterinarian, member of the admissions committee of the Ohio State University Veterinary Medicine School and Health Commissioner of Madison County. After viewing a videotape of appellant using a wiffle ball bat to distract an animal by tapping it on the head, Dr. Herman opined it was an acceptable practice in the State of Ohio. T at 579. Dr. Herman testified that not only has he seen other veterinarians use this procedure, he believed he taught appellant to do it when she was an intern in the veterinary medicine program. Counsel for appellant also asked Dr. Herman about the appropriate use of a slip leash as a method of restraint. Dr. Herman testified:
A. I've used this a lot.
Q. So what is your opinion?
 A. Well, my opinion is, you know, if you've got a fractious animal like you saw in the . . . It doesn't take a genius to pick them up off the ground. You might be able to get ahold of that animal.
You don't have very many ways to restrain animals. One of them is holding; chemicals, like tranquilizers and that, but those aren't always perfect, as I can attest. But you have to hold those animals until you can get an injection in them. They just don't sit there while you give them an injection or they don't sit there while you're trying to grab them. They don't sit there while you're trying to muzzle them, as you can see. People don't understand what a factious animal is until you show them.
Dr. Herman also testified, in his professional opinion, it was not possible unless a tooth was abscessed, diseased, or ready to fall out, that a dog's tooth could be knocked out with a wiffle ball bat. In fact, Dr. Herman testified "if you took a ball bat you could not knock them out; you'd break the jaw first." T. at 591. Appellant then presented the testimony of Dr. William Gesel a veterinarian. Dr. Gesel worked for the City of Columbus as a Public Health Veterinarian. In 1995, he inspected the Vet One Clinic. At that time, he did the inspection because the Board received a complaint appellant was performing surgery in dirty areas and the clinic was unsanitary. After his unannounced inspection, Dr. Gesel stated he saw no cause for concern. He did testify he remembered the facility was cramped and cluttered, and the back storage area showed signs of rodents. However, after completing his investigation, the matter was terminated. Finally, appellant testified on her own behalf. In response to specific allegations made by previous witnesses, appellant testified the clinic was generally in a clean and tidy fashion. However, on the date of the inspection, she was attending her husband's father funeral, and believed her staff was lax in tiding up and cleaning animal cages. In response to accusations she routinely beat the animals in her care, appellant testified the allegations were "100% false." T. at 597. She testified she had never taken a wiffle ball bat over her head to beat any animal. In response to the allegations, appellant knocked out dogs' teeth the wiffle ball bat, appellant introduced Exhibit MM, a picture out of Miller's anatomy of the dog, to show how it would be virtually impossible to knock a tooth out with a heavy object let alone a plastic wiffle ball bat. T. at 600. Appellant testified after surgeries she would place animals on a clean and sanitized floor. T. at 605. When the animal could sit up, an assistant would put the animal in a cage to keep it from wandering off. Appellant testified placing an animal directly on a clean floor allowed for better monitoring of bleeding or waste. As to the allegations appellant allowed lay people to perform surgeries, she admitted she had done so but did not know it was a violation at the time. She stopped the practice immediately after she was advised of the violation. After the three day hearing, the hearing examiner issued a Report and Recommendation directed to the Board. This document, which was filed with the Board November 10, 1997, summarized the evidence presented in the hearing, and stated proposed findings of fact and conclusions of law. The Report specifically dismissed charges appellant abused the named animals in the charge 4 of the Notice. In addition, he dismissed charges appellant filed false reports against Dr. Fuller, and the charge appellant gave away a great Pryrenees after reporting the dog dead. The hearing examiner found appellant had in fact committed the remaining acts charged in the Notice, and alternatively recommended appellant be fined, suspended and/or have her license revoked as a penalty for these violations. In the event the board agreed with his findings of "abuse and cruelty", The hearing examiner recommended a revocation of appellant's license. The hearing examiner further recommended two thirty day suspensions from practice; one for failing to maintain sanitary conditions; and a second for permitting lay persons to administer veterinary services, failing to meet with clients, providing false reports, and negligent veterinary services. On December 19, 1997, the Board adopted the hearing examiner's findings of fact and conclusions of law, and revoked appellant's veterinary license. In its Finding and Order, the Board found appellant violated numerous statutory provisions, including those for the humane treatment of animals. Appellant timely filed an appeal of the administrative order to the Licking County Court of Common Pleas. In a February 20, 1998 Judgment Entry, the trial court affirmed the Board's Finding and Order. It is from this judgment entry appellant prosecutes her first appeal 98CA00025, assigning the following as error:
 I. THE TRIAL COURT'S FINDING THAT THE OHIO VETERINARY MEDICAL LICENSING BOARD'S DECISION WAS SUPPORTED BY RELIABLE, PROBATIVE, AND SUBSTANTIAL EVIDENCE WAS UNREASONABLE, ARBITRARY AND UNCONSCIONABLE AS WELL AS UNSUPPORTED BY THE RECORD AND THEREBY CONSTITUTED AN ABUSE OF DISCRETION.
 II. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FINDING THAT THE OHIO VETERINARY MEDICAL LICENSING BOARD'S DECISION WAS IN ACCORDANCE WITH LAW.
On July 7, 1998, appellant filed a Motion to Stay Proceedings, and a Motion for Leave to File a Motion to Reopen the Hearing before the Ohio Veterinary Medical Licensing Board. In a Judgment Entry dated July 14, 1998, this Court granted appellant's motion and stayed the appeal in Case No. 98CA00025 pending any reconsideration. On August 10, 1998 appellant filed its Motion to Reopen with the Board. The Memorandum in Opposition to the motion was filed August 17, 1998. On October 28, 1998, the Board voted to deny the motion to reopen the hearing based upon lack of jurisdiction. On November 12, 1998, appellant filed her notice of appeal from the Board's decision not to reopen the evidentiary hearing. On December 1, 1998, the Board filed a Motion to Dismiss for lack of jurisdiction. In a Judgment Entry dated December 22, 1998, the trial court granted the Motion to Dismiss. It is from that decision appellant prosecutes her second appeal, Case No. 98CA00138, assigning the following as error:
 I. THE OHIO VETERINARY MEDICAL LICENSING BOARD ("VET BOARD" OR "OVMLB") ERRED AS A MATTER OF LAW BY ISSUING AN ADJUDICATION ORDER ADOPTING A HEARING EXAMINER'S REPORT, WHICH REPORT FOUND DR. WILDE GUILTY OF ABUSING "NUMEROUS OTHER ANIMALS". THE FINDING OF ANIMAL ABUSE WAS NO SUPPORTED BY R